## THEODORE BLISS *versus* CHARLES G. RICE *et al.*

If the owner of the land on one side of a river erects a mill dam across the river, without obtaining permission from the proprietor of the opposite shore, this is an adverse and injurious invasion of the rights of this riparian proprietor, although he may then have no occasion to make use of the water, and if the dam be continued a sufficient length of time, will authorize the jury to presume a grant of the right to abut the dam on such opposite shore.

Where a right is granted by a riparian proprietor to abut a mill dam on his shore, the grantee has *primâ facie* a right to all the water power created by the erection of the dam, and the burden of proof is upon the grantor to show that the grant was made with limitations or restrictions respecting the use of the water.

The circumstance that the grantee set up one kind of mill rather than another, or did not, or could not profitably, erect mills with sufficient machinery to require all the water of the river at all times, is not sufficient to limit the presumed grant of all the power which can be obtained by the dam.

The grantor of the water power created by a dam, has no right to divert or use the water which runs over the dam, for this water increases the head, and of course makes a part of the water power created by the dam.

Where the land on one side and to the thread of a mill stream, with the water privilege, are owned by tenants in common, one of whom also owns the land on the opposite side, to the thread of the stream, this is not such a unity of possession as will extinguish in the whole or *pro tanto,* the water easement belonging to the tenants in common.

The plaintiff and the defendant being tenants in common of a mill on one side of a stream and of the mill dam and water power, occupied the mill alternately, in pursuance of a verbal agreement, each of them several days at a time, in proportion to his interest; and the defendant, being the owner of the land on the opposite side of the river, cut a channel from the mill pond, above the dam, on his several land, and thereby conducted a portion of the water to drive machinery on his several land. It was *held*, that such alternate use of the common property was an equitable and legal division so long as the parol agreement should remain in force, and that each cotenant, during his turn, had a right to use the whole of the water in such manner as he pleased, doing no injury to the common property ; and the Court refused to enjoin the defendant to fill up his channel, it not appearing to be injurious to the common property, or to desist from drawing water by it during his turn; but he was enjoined against drawing water during the plaintiff's turn.

In a bill in equity to enjoin the defendant from diverting water from a saw-mill, and to recover damages for a past diversion, the plaintiff offered the evidence of a

Bliss
v.
Rice.

witness who, during the diversion, was under a contract to tend the mill, by which his compensation was in proportion to the timber sawed, and of another who was under a similar contract at the time of testifying. It was *held*, that these were competent witnesses, as to the damages, for the damages to be recovered would belong entirely to the plaintiff, and if the witnesses were injured by the diversion, they must bring their actions, in which the judgment in this case would not be evidence.

THIS was a bill in equity, filed May 30, 1833. The bill alleges, that the plaintiff and one Blake are seised in fee, as tenants in common, of an ancient mill site on Mill river, in Springfield, of the saw-mill thereon standing, and of the dam across the river, and of the exclusive right to the use of the stream, at the dam, and above it as far as the tail of the mill next above on the same river ; that the defendant Rice, about August 1, 1832, erected a shop on the [south] shore opposite and a little below the saw-mill, for the purpose of manufacturing lead pipes and for other uses, and, against the remonstrances of the plaintiff, cut a channel or flume through the rocks and soil around the southerly end of the dam where it abuts against the southerly bank of the river, opposite the saw-mill, and cut down the embankment of the pond above the dam, about two feet deep and about two feet wide, by which he drew and diverted, and continues to draw and divert, water from the pond to the wheels and machinery in his shop, thereby preventing the water from flowing to the saw-mill, for the use thereof, as the proprietors of the saw-mill and dam had, and still have, a right to have the same flow and be used, and depriving them of the exclusive privilege of the stream ; that these acts of Rice will injure and depreciate the value of the saw-mill, mill site, and privilege, and that the dam will become undermined and the southerly bank where the water is drawn off by Rice will become broken and ruinous ; and that Blake has refused to become a party complainant in the bill, and has confederated with Rice to injure the plaintiff, and has given Rice license and authority for committing the acts complained of : — And the bill prays that Rice and Blake may be required to answer, &c., and that Rice may be enjoined to abstain from turning the water into the channel cut by him, and to fill up this channel, and to restore the bank and the abuttal of the dam to as good and secure a condition

as they were in at the time immediately before the committing of the trespass alleged, and to make full compensation to the plaintiff for the damages he may have sustained.

In September, 1833, Rice filed an answer, in which he alleges, that, before the committing of the supposed grievances, he was, and now is, seised in fee and possessed of the land lying south of and adjoining the river opposite to the mill site and saw-mill, and extending above and below the dam, and extending also to the thread of the river, and was then, and now is, seised in fee of the right to a moiety of the water of the river at the dam, and to such portion of the dam as was and is so upon his land ; that all the time he was so seised, and up to the time of filing the bill, the dam was built and kept up as high above the bed of the river there as he and other joint owners thereof had a right to have the same built and kept, and as high, he believes, as the owners had from time immemorial built and kept it ; that on March 10, 1818, Jonathan Dwight junior and James S. Dwight were seised in fee and in common of fourteen twenty-fourth parts of the mill site and saw-mill and the privileges thereto belonging, and Jonathan Dwight junior was also seised in fee of the tract of land now owned by this defendant, on which his shop, channel and flume are situated, and that on that day Jonathan Dwight junior conveyed to one M'Gregory, in fee, the land owned by this defendant, together with the privilege of taking the water from the top of the old saw-mill dam in a conductor of the same size theretofore used, to lead the water from the dam to a shop on this land, and from the same place in the dam, fourteen days out of every twenty-four, and no more, without injury to the saw-mill ; that on the fourteenth of the same March, Jonathan Dwight junior and James S. Dwight conveyed to Blake the fourteen twenty-fourth parts of the mill site, mill, and privileges thereto belonging, reserving however to M'Gregory, his heirs and assigns, the right of taking the water from the top of the dam in the manner theretofore taken by Asher and Pliny Bartlett, in a conductor there placed, and as specified in the deed to M'Gregory ; and thereupon this defendant says he is informed and believes, that before the date of the deed to M'Gregory, the surplus water of the

Bliss
v.
R ce.

pond, down to the top of the dam, had been accustomed to be drawn at the pleasure and will of the owners of the land conveyed by that deed, for and during fourteen out of every twenty-four days, when Jonathan and James S. Dwight, and those under whom they claimed title, had, by the usage and understanding before recited, the exclusive occupancy and use of the saw-mill and its privileges ; that about the 17th of August, 1831, Edmund Dwight, being seised in fee of the right to take water so conveyed to M'Gregory and of the land on which this defendant's shop, channel, flume and the south end of the dam are situated, conveyed the same to the defend-ant, with all the rights and privileges thereto belonging.  This defendant then admits that about August 1, 1832, he erected a shop as alleged in the bill, and cut a channel on his land through the rocks there, beginning about eight feet above the top of the south end of the dam and passing several feet south of the south end of the dam, and cut down the natural soil or hill of rocks forming the embankment of the pond above the dam, about eighteen inches deep and two feet wide, and about twelve feet long, and constructed from the end of the channel so cut, a substantial flume of plank, open at the top, (and the top of which is higher in all its parts than the top of the dam,) and extending to his shop, for the purpose of conducting water from the pond to the water wheels and machinery in his shop, and that he has thereby occasionally, from the 1st of August, 1832, to the time of filing the answer, drawn water from the pond to his water wheel ; but he denies that he has thereby diverted from the saw-mill the water which ought of right to flow there.  This defendant further says, that for a great number of years past, there have been several proprie-tors of the saw-mill and of the privileges thereto belonging, as tenants in common, and that they have, by agreement and understanding among themselves, each occupied the same exclusively for a given number of days, according to the pro-portions of the interest of the several owners, assuming twenty-four days as the whole number allotted to all ; and that for many years past and up to July 9, 1833, the plaintiff and Blake have occupied the same and in the same manner, and Blake, with the plaintiff's consent, has occupied the same

exclusively fifteen out of every twenty-four ; and that Blake, being so tenant in common of fifteen twenty-fourth parts of the saw-mill and its privileges, did so far as he might by possibility have any right to object thereto, give this defendant license and authority to cut the channel, and to draw thereby as much water as he should choose to draw, for the use of his shop and machinery, during the fifteen days in each twenty-four days when Blake should have a· right to the occupation of the saw-mill, and at all other times so much water as this defendant might wish to draw, provided that at such other times he should draw only the surplus water or such as would otherwise flow over the dam, and should not draw the water which otherwise might be used in the operation of the saw-mill ; and that this license and authority was continued until July 9, 1833 ; and this defendant admits, that he has drawn the water by means of the channel, according to this license and authority, but not otherwise ; and he alleges that, before he began so to draw water, he put in his flume a close gate, capable of preventing the passing of water, and that he has always kept it well closed except when he has drawn water pursuant to the license.    And this defendant denies that he has by his acts injured and depreciated the value of the saw-mill, mill site, or privilege, or that the dam will thereby become undermined, or that the bank on the southerly side of the river will become broken and ruinous, or that the plaintiff has sustained, or will sustain, any damage in the diminution of water that ought to flow to the saw-mill.    And this defendant further states, that on July 9, 1833, Blake conveyed to this defendant in fee, fifteen twenty-fourth parts of the saw-mill and mill site, and of the privilege of water and other privileges thereto belonging, with any right Blake had of abutting a dam on the south shore, by virtue of which conveyance this defendant became seised in fee and in common with the plaintiff.

Blake also filed an answer.

Much evidence was introduced by the parties for the purpose of showing their respective rights, whether arising under actual grants or by prescription ; and the case was elaborately argued in writing, by *Wells* and *W. Bliss*, for the plaintiff,

and *I. C. Bates* and *G. Bliss*, for the defendant Rice. The opinion of the Court recites as much of the evidence as is requisite for understanding the points of law decided.

For the defendant Rice, it was, among other things, contended, that on the supposition of a lost deed from the proprietor of the south shore to the proprietor of the north shore, authorizing the erection of the dam, the grant must be limited by the user, and consequently the latter had a right to abut a dam on the south shore, raise a pond, and use water sufficient for a saw-mill ; but it could not be presumed that such a deed gave a right to exclude the riparian proprietor on the south side of the river, from using water (not however exceeding half of the stream) which was not wanted or used for the saw-mill. 3 Kent's Comm. (1st edit.) 356 ; Angell on Water-Courses, 48 ; *Bealey* v. *Shaw*, 6 East, 219 ; *Saunders* v. *Newman*, 1 Barn. & Ald. 261, 262 ; *Stiles* v. *Hooker*, 7 Cowen, 266 ; *Curtis* v. *Jackson*, 13 Mass. R. 507 ; *Martin* v. *Goble*, 1 Campb. 320 ; *Brown* v. *Best*, 1 Wils. 174. The erection of a dam across a river by the owner of one shore, is not an appropriation of the whole water, but the appropriation is coextensive only with the use. The proprietors of Locks and Canals on Connecticut river have erected a dam across the river in order to supply their canal, but can it be supposed that they have thereby appropriated the entire water of the river, so that no one else can use it on either side ?

Mere lapse of time will not, of itself, as against the owner of a right, raise a presumption of a grant ; *Gray* v. *Bond*, 2 Brod. & Bingh. 667 ; and here circumstances existed which prevented the running of a prescriptive title. The use by the saw-mill proprietors was not adverse. The witnesses state that the south bank is steep, rocky and abrupt. The owners of that shore have had no occasion to use any water there, or to exercise any of their riparian rights, until this contest arose ; and they could not previously be injured by the uses to which the proprietors of the saw-mill appropriated the water. Angell on Water-Courses, 70, 71; *Cooper* v. *Barber*, 3 Taunt. 99 ; *Sargent* v. *Ballard*, 9 Pick. 251 ; 3 Stark Evid. 1216 *et seq.* ; *Jackson* v. *Sharp*, 9 Johns. R. 167

*First Parish in Medford* v. *Pratt*, 4 Pick. 222 ; 3 Dane's     Bliss
Abr. 252.                                                         *v.*
                                                                 Rice.
The easement claimed against the defendant has been ex-
tinguished by unity of possession and title of the land on both
sides of the river.   The evidence shows, that within twenty
years the greater part of the estate on the north side has been
owned by the proprietor of the land on the south shore.   Nor
is it material that there has not been a union of the entire title
on both sides.   The entire estate on the south side having
been owned by a tenant in common of that on the north side,
there was no one who could be presumed to be assenting to
the acquiring of an easement against the estate on the south
side.   But if, in order to extinguish the entire easement, there
must be a union of the entire titles on both shores, then as
the evidence shows that two of the shares owned by the
plaintiff were owned within twenty years by the proprietor of
the south shore, the prescriptive right is extinguished as to
those two shares.

   Admitting that, at the time of the grievances complained
of, the plaintiff and Blake had a prescriptive right to the
whole water of the stream, they were entitled to use it either
for the saw-mill or for other purposes, in the proportions of
nine twenty-fourths and fifteen twenty-fourths ; and if the
plaintiff did not choose to use any, Blake had a right to use
all ; or if the plaintiff chose to use what was wanted for the
saw-mill only, Blake had a right to use the residue.   If Blake
had this right to use the water himself, he had an equal right
to authorize any one else to do it ; and under these circum-
stances he gave Rice the license set forth in the answer.

   It may be objected, that Blake, on account of his relation
as tenant in common, could not give the license ; but this ob-
jection is obviated by the fact, that according to an immemo-
rial usage, the plaintiff and Blake were entitled to occupy in
severalty by days, and exclusively, according to the extent of
their interests.

   The damages, if the plaintiff is entitled to recover any,
should be calculated only up to the time of filing the bill,
or, at most, of filing the answer.   If the plaintiff may give
evidence of acts of trespass done after the bill is filed, and
                          3 *

not alleged in it, he deprives the defendant, not only of the privilege of averring in his answer, facts and circumstances in justification or palliation, but deprives him of the benefit of his oath in proving them.

The depositions of Warriner and Pease, in relation to damages, are inadmissible, on the ground of interest in any damages which may be recovered. Warriner states, that under a contract with the plaintiff, of January 1, 1834, he tends the saw-mill, and has for his compensation $1·25 for every thousand feet which he saws ; that "his profits depend upon the quantity of work done and the capacity of the mill to do work, and they are affected by the increase or diminution of the water during the time the deponent works." He is palpably interested, if he may testify as to acts done by the defendant after January 1, 1834. Pease testifies that he was, "until very recently," under a similar contract with the plaintiff, made in 1831. He had a direct interest in all damages claimed arising before and after the bill was filed.

For the *plaintiff* it was contended, that the right to erect the dam was acquired by his predecessors, under an ancient grant by the town of Springfield ; that the evidence was sufficient to establish this right on the ground of adverse possession ; that by erecting the dam, whether under an actual or a presumed grant from the owners of the south shore, the owners of the saw-mill became entitled to the entire water privilege ; that the extent of their right was to be measured by their appropriation, and not by their actual use of the water ; though here, upon a reasonable construction, the appropriation and the use had been co-extensive ; that the portion of water which flowed over the dam contributed to the effective power of the pond, and was a part of the appropriation ; *Tyler* v. *Wilkinson,* 4 Mason, 397 ; *Bullen* v. *Runnels,* 2 New Hamp. R. 255 ; 3 Kent's Comm. (1st edit.) 358, 359 ; *Stiles* v. *Hooker,* 7 Cowen, 266 ; *St.* 1795, *c.* 74, § 1 ; that if the presumed grant, in a case of prescription, is made with any restriction or limitation, the burden of proof is on the party alleging the restriction or limitation ; *Finch* v. *Resbridger.,* 2 Vern. 391 ; *Belknap* v. *Trimble,* 3 Paige, 591 ; that a right to a water-course is not extinguished by

unity of possession, but the plaintiff was not obliged to resort to this principle, for here there was no such unity of possession as would destroy any easement, because it did not appear that at any time since the erection of the dam, the owners of the north and of the south shore have been the same persons ; that notwithstanding the alternate occupancy of the saw-mill by the plaintiff and Blake, they remained tenants in common, a partition by parol being void ; and that one tenant in common cannot prejudice his co-tenant, and Rice therefore could not justify cutting his channel, or using any of the water during the plaintiff's turn, either under the license from Blake, or by virtue of being tenant in common subsequently to Blake's conveyance to him ; *Porter* v. *Hill*, 9 Mass. R. 35 ; *Colton* v. *Smith*, 11 Pick. 315.

PUTNAM J. delivered the opinion of the Court. We consider the questions submitted to us, on the ground that the defendant Rice had the lawful possession or title to the land on the south shore bounded northerly by Mill river, opposite to the saw-mill privilege on the north shore, owned by the parties as tenants in common.

The plaintiff claims, that the proprietors of the saw-mill on the north side of the river, own the whole stream or water power of the river, together with the dam, and a right to abut the dam upon the south shore, and a right to flow any lands on the south shore which can be flowed by means of the dam, for mill purposes.

The defendant Rice resists that claim, and he claims as owner of the south shore, a right of property in the soil to the thread of the river and in half of the stream and of the dam ; — or if the proprietors of the saw-mill have acquired a right to abut their dam upon the south shore, Rice alleges that it is for the limited purpose of raising a pond to drive a *saw-mill only :* — and he claims that the surplus water, viz. that which runs over the top of the dam, belongs to him rightfully as he has drawn and used it, as the riparian proprietor of the south shore.

We proceed to inquire, whether the proprietors of the saw-mill have an absolute, or only a qualified right to the river against the south shore opposite to their mill privilege.

In 1638 the site now occupied for the saw-mill was granted by the proprietors of Springfield to William Pynchon. It is part of 17 acres then granted, and it was then "adjoining to the mill." William Pynchon conveyed to John Pynchon and others, in 1654, and it is stated in the conveyance, that the land had been given by the town to *William Pynchon for a mill lot*; that it contains 17 acres, more or less, with the mill standing on it, and all its appurtenances; that the breadth is 20 rods, and that it runs in length east from the great [Con necticut] river until the 17 acres are made up; and that it is bounded on the south by the Mill river. The saw-mill of the plaintiff is upon a part of the 17 acres granted for a mill lot, and the bounds of the lot can be ascertained at this day with great accuracy. The proprietors of the township owned on both sides of the Mill river, and the whole of the stream.

It does not appear when the first dam was. built upon this privilege; and there is no record produced, of a saw-mill being upon this site until 1742. The south shore is precipitous and of solid rock or red stone, and no mill or machinery was ever placed there until 1809, when a smith's shop was erected there by the Messrs. Bartlett, who paid the proprietors of the saw-mill for the water they used.

Dams have been repeatedly rebuilt by the proprietors of the saw-mill lot, within the time of memory, (according to the testimony of Obed Lombard,) of about the same height with that now existing and upon or near to the same place. "They had (said Lombard) the exclusive and uninterrupted use and occupation of the dam and water of the saw-mill pond. He never heard their right challenged by any person or persons within his memory; (he was 68 years old;) he never knew of the water of said pond being used or enjoyed by any other person, until the Bartletts built their shop; and they made no claim to any water except what they hired of the saw-mill owners." The defendant's shop is upon the place where the Bartletts' was.

This evidence is corroborated by several witnesses, and is wholly uncontradicted. Indeed the opening counsel for the defendant admits that "the evidence undoubtedly is, that until 1818 no water had been used upon the south shore withou

the license of the saw-mill owners, for mill purposes, and that the saw-mill owners have not been interrupted in the use of the dam and water of the pond."

Now taking it for granted, (which is not proved, however,) that at the time when the dam was first built, the land on the south side of the river was owned by other persons than those who owned the mill lot, and that the burden of proof is on the plaintiff to establish his right to the dam, &c. what is the legal result from the above facts ? Unquestionably (as we all think) that there was a grant from the owners of the south side of the river to the owners of the mill lot on the north side, that the latter should have a right to build the dam and raise a head or pond of water for mill purposes, for their own use. And if the grantor owned the land on both sides and the stream, the grantee would be legally entitled to the same rights and privileges.

It is however contended for the defendant, that the owners of the south shore were not injured by the acts of the owners of the saw-mill, until they had occasion to use the water, in virtue of their right of property to the thread of the river ; and therefore the claim which the owners of the mill lot made, was not adverse, and it affords no presumption of a grant.

But unless there were a grant of a right to build a dam, the owners of the mill lot must have made a direct and injurious invasion upon the owners of the south shore, by taking the actual possession of their land from the thread of the river on the south side to the south end of the dam ; and this was the occupation of a mill privilege. What act could be more notorious, adverse, and injurious ?

We all think that a jury should be directed, under the evidence above stated, to presume a grant from the owners of the south shore to the owners of the north shore and mill lot, to build the dam, and to have all the benefit, water power and privileges which would arise from the erection of the same. The extent of their right would be measured by the height and capacity of the dam, and not by the partial use of the water power created by it ; unless the owners of the south shore could establish the fact, that the grant was made with limitations or reservations. And the burden of proof of

the limitations or reservations would rest upon the defendant His counsel have earnestly contended, that the owners of the mill lot have occupied only for a saw-mill, and have no more right than to water enough to drive a saw-mill ; and that the grant should be presumed to have been made with limitations corresponding with the subsequent use of the water.

But if we are right, that the legal presumption from the facts is, that the owners of the south shore granted to the owners of the mill lot on the north shore a right to build a dam across the river, it would necessarily follow from the exercise of that right, that thereby the grantees appropriated all the water of the river to their own use. Such would *prima facie* be the legal result ; and the circumstance, that the proprietors of the mill lot set up one kind of mill rather than another, or that they did not, or perhaps that they could not profitably, erect mills with sufficient machinery to require all the water of the river at all times, ought not to be considered as sufficient to limit the grant, or the water power which could be obtained by the dam. It may be, that in large rivers a beneficial use may be obtained by a dam on one side of the river, without butting it upon the other side. Instances of this kind may be found upon the Connecticut river. But in such cases it is the dam, and not the use of the water, that regulates the right, in the absence of any limitation or reservation in the grant of the right to build the dam. But the grant which must be presumed in this case, of the right to build the dam across the river, and the building of it and continuing and renewing of it, at their own expense, for their own use according to the evidence, was an appropriation of the whole stream and mill privilege adjoining to that part of the mill lot now owned by the proprietors of the saw-mill.

Such appears to have been the claim of the proprietors of the mill lot, and no adverse pretension is made until nearly eighty years after a saw-mill was set up upon the plaintiff's mill lot. In 1818 M'Gregory, owning the land now belonging to the defendant on the south shore, set up a claim substantially like that now made by the defendant. It appears that the Bartletts purchased the same land on the south shore in 1804 ; but that so far from making any claim adverse to that

ot the owners of the saw-mill, they hired and paid the owners of the saw-mill for what water they took. We have three receipts, one, June 1, 1809, another, August 27, 1812, another, August 27, 1813, showing this fact. The last receipt is dated within twenty years of the filing of the plaintiff's bill, which was on the 20th of May, 1833. If the Bartletts had thought that they had a right to the water, we do not believe they would have hired it of the saw-mill owners. The apologies which the ingenious counsel of the defendant make for that act of the Bartletts, are altogether unsatisfactory. We cannot suppose, from the spirit manifested by the claimants of water power in this State, that such a right would be surrendered merely to avoid a lawsuit. And although they took the water by a conductor cut into the top of the dam, and the defendant takes the water by a conductor let into the pond above the dam, yet substantially it was the same thing, so far as it regarded the owners of the saw-mill. It was the water which was obtained by the one or the other mode, which was then the subject of hiring by the Bartletts, and which is now claimed as of right by the defendant, as the owner of the same land on the south shore of the river. The suggestion that the Bartletts might have wanted the water for some temporary purpose, is not warranted by the evidence, and if it were, would not justify the inference, that they waived their legal rights. Nor is the suggestion, that they would have subjected themselves to repairs upon the dam to a greater amount than the hire, a satisfactory explanation. For upon the hypothesis of the defendant, the dam was granted to the proprietors of the mill lot on the north shore, opposite to the defendant's land, with a reservation of a right to take the water that should run over the top of the dam ; and if so, the exercise of that right would not have subjected the owners of the south shore to any expense of repairing the dam. We cannot but regard the fact of hiring as a very strong proof and acknowledgment of the absolute right of the saw-mill owners to the whole water power. The acts and declarations of the Bartletts upon that matter, being against their own interests, were clearly admissible

The water, a foot, more or less, in depth, that runs over

Bliss
v.
Rice.

the top of the dam, is not, as it regards the mill owners on the north side, to be considered waste or surplus of no value The head, and of course the water power, is thereby in creased. And it should be kept in mind, that it was the water power which could be obtained by the erection of the dam, which was granted by the owners of the south shore to the owners of the north shore. It is very clear to us, that the owners of the south shore could not lawfully do any act which should interfere with that grant.

Nor were the proprietors of the mill lot obliged to use the water for a saw-mill merely. The presumption is, that it was a grant to make a dam to raise the water for mill purposes. It is an old and familiar doctrine, that the owner of the water power may change his mill, *e. g.* a corn-mill to a fulling-mill, &c., as his interest may direct. In the absence of reservations or limitations, the use to be made of the water power is to be regulated by the grantee.

It is contended for the defendant, that the easement has been extinguished by unity of possession, inasmuch as the defendant is owner of the south shore, and owner, as a tenant in common, of the mill lot opposite. But the evidence does not prove such a unity of possession as would destroy any easement ; for there is no proof that, from the time unknown when the dam was first built, unto the present time, the same individuals have owned this mill privilege and the land adjoining to it on both sides of the river.

But it is contended for the defendant, that he had the verbal permission of George Blake, one of the tenants in common, to draw the water, until the time when Blake conveyed his shares to the defendant, and that afterwards the defendant became tenant in common and entitled to draw the water as he has used it.

This leads to the consideration of the rights and power of tenants in common in and over this common property.

It is very clear that they cannot lawfully do any acts which go to the destruction or injury of their common interest ; and no such claim is made by the defendant. It is contended however for the plaintiff, that the introduction of the conductor 'nto the pond above the dam, and leading the water by the

side of it to the works of the defendant, is an act tending to weaken and destroy the dam, and necessarily therefore unlawful. But the evidence is entirely satisfactory to us, that the taking out and conducting the water as the defendant has done, does not affect the security of the dam. The testimony of Sexton, of Badger, and of White, to that point, is direct. The thing indeed speaks for itself. The channel is cut in solid rock or red stone, and secured by planks. From the evidence, we are satisfied that there is no danger to the common property ; the act of the defendant cannot therefore be regarded as tending to its destruction. But if it should prove otherwise, the party constructing the channel would be answerable to the co-tenants who do not consent to the making of it.

In the present aspect of the cause, the evidence does not satisfy the Court, that an injunction should be granted against the use of the channel by the defendant, merely on account of the apprehended danger to the dam.

The bill and answer admit that the parties are tenants in common. The evidence is, that they have generally, if not uniformly, by verbal agreement, occupied in severalty one day for each share, for their whole number of shares, successively. Now that is the manner in which parceners may have partition of entire inheritances, which cannot be divided by metes and bounds : — of a villein, for example ; one may have his service one day or month, and afterwards the other, for another day or month. So of an advowson ; they may present by turns. *So of a mill ;* for one shall have it for so long a time, or one toll dish, and the other, for a like time afterwards, or the second toll dish. Com. Dig. *Parcener, A 2,* citing Co. Lit. 164, 165.

The same mode of partition would apply here, as to tenants in common. We regard the mode in which the tenants in common of the saw-mill have occupied, as both equitable and legal. Such agreement or license by parol would be valid during its continuance.

We are not called upon in this suit, to settle the number of shares to which the co-tenants are respectively entitled, but the rights and privileges applicable to the parties, touching the

Bliss
*v.*
Rice.

use of their shares respectively. We take it for granted, that the parties own as they have occupied, viz. that the plaintiff has nine, and that the defendant has fifteen twenty-fourth parts or shares. The defendant occupied by the parol license of Blake, until Blake conveyed, and afterwards under the deed of Blake. Then the defendant, during his turn, would have the entire and several use of the common property for fifteen days, and the plaintiff the entire and several use of it for the next succeeding nine days, and so onward as long as the parties should agree so to occupy, or until an actual partition should be made by some proper legal process, upon the principles before stated.

We are of opinion, that in and during the several turns, each occupier is legally entitled to have the use of the whole property which is owned in common, and neither could obstruct or interfere with the other in regard to any mode of using the water power, which should not be injurious to the common property.

We have seen that the defendant's taking the water from the pond, above the top of the dam, by means of his channel, is not now considered to be injurious to the dam. And we are of opinion, that during the defendant's turn he had the right to conduct and use the water by means of his channel and conductor, as he has done, and that no injunction should issue to restrain him from such a use of the water during his turn. It is however declared, that any damage or injury that may (contrary to the evidence and present appearances) happen to the dam or other property owned in common, by means of the defendant's channel or conductor, and of his taking the water thereby, as now constructed, shall be made good by the defendant to the co-tenant. In this respect he takes the water, continues the channel and uses the same during nis turn, *suo periculo.* And when his turn is finished, he is effectually to close the channel or conductor, so that no part of the water shall be taken thereby from tne pond, during the plaintiff's turn. In all other respects the defendant is entitled, during his turn, to the several use of the whole property owned in common, without account to his co-tenant, excepting in regard to any acts that are injurious or destructive to the com-

mon property. And from the premises it follows, that the plaintiff, during his turn to occupy for his nine days, or shares, is to have the several use of the whole property owned in common, without account to his co-tenant, excepting for or in regard to any acts that are injurious or destructive to the common property.

An injunction is to be granted to restrain the defendant, during the plaintiff's turn, from taking any water from the pond by means of the defendant's channel, or otherwise, for mill purposes.

The defendant is accountable in this suit, to the plaintiff, for the use the defendant has made of the water, during the plaintiff's turn. It was either waste or nuisance so to take it ; waste, if done under Blake's license or deed ; nuisance, if done by the defendant as a stranger. We think he is to be considered as having acted under Blake, who was the co-tenant with the plaintiff.

Under this process the Court has full power in equity to adjust the claims of the parties. The plaintiff is unquestionably entitled to damages. Having expended a great deal of labor upon this cause, and become somewhat familiar with the facts, we are disposed to save the parties from any further litigation and expense, by determining the amount of damages ourselves, instead of referring that question to a master.

The testimony of Walter Warriner and of Jonathan Pease has some bearing upon this matter.

It is contended for the defendant, that these witnesses are interested, because they were to have a certain sum per thousand for tending the saw-mill and that they would have sawed more if the defendant had not taken any. part of the water during the plaintiff's turn. If they have such an interest, it is, from the whole evidence, too small to be measured with any tolerable exactness. But if they have been injured even in their minute interest, unless it should fall within the rule *de minimis* &c., they must bring their appropriate action, and the judgment in this suit will be no evidence in their suit. They are not parties to this record, and the damages will belong entirely to the plaintiff.

Some question has been made as to the time up to which

Bliss
*v.*
Rice.

the damages are to be calculated, whether to the time of bringing the bill, or to the filing of the answer, or to the final decree. And considering that, in effect, this is in the nature of ascertaining what should be paid for the use of the plaintiff's property, and that evidence has been taken of the value since the bill was brought, as well as before, we are disposed to carry the calculation up to this decree, and not leave the small matter of damages from the commencement of the suit to the time of the decree, a subject for future litigation. It is, after all, rather a matter of account, than a wanton act of trespass, which is now to be adjusted. If it were of the latter character, we should stop at the bringing of the bill, or at most, the filing of the answer, to give the party defendant an opportunity to answer further. But we here see the whole controversy as to this point. The question is, how much ought the plaintiff to recover of the defendant for the use which the defendant has made of the water, during the plaintiff's turn for using it. And upon a careful review of the evidence, without now giving it in detail, we think it should be at the rate of twenty-four dollars a year for the nine shares claimed by the plaintiff.

<div align="center">

*Decree accordingly, with costs for the plaintiff.*